**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEVIN COIT,** | : | |
| **Plaintiff** | : | **No. 1:19-cv-02036** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **JP LUTHER, et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

This matter is before the Court pursuant to Defendants' motion for summary judgment. (Doc. No. 39.) The motion is fully briefed and ripe for disposition.

**I.     BACKGROUND**

On November 27, 2019, pro se Plaintiff Kevin Coit ("Plaintiff"), who is currently incarcerated at the State Correctional Institution Phoenix in Collegeville, Pennsylvania ("SCI Phoenix"), initiated the above-captioned action by filing a complaint pursuant to 42 U.S.C. § 1983 against Defendants JP Luther ("Luther"), Lisa Hollibaugh ("Hollibaugh"), C. Wakefield ("Wakefield"), Rivello ("Rivello"), Sunderland ("Sunderland"), Swisher ("Swisher"), K. Grassmyer ("Grassmyer"), C. Shope ("Shope"), E. Stombaugh ("Stombaugh"), Ellenberger ("Ellenberger"), Dickson ("Dickson"), T. Dell ("Dell"), J. Wasko ("Wasko"), D. Williams ("Williams"), C. Garman ("Garman"), B. Fisher ("Fisher"), Ralph ("Ralph"), Debra Jadlocki ("Jadlocki"), and Szelewski ("Szelewski").  (Doc. No. 1.)  On December 5, 2019, Plaintiff filed 373 pages of exhibits to his complaint.  (Doc. No. 10.)

Plaintiff filed his complaint while he was incarcerated at SCI Smithfield, raising claims regarding events that allegedly occurred during his incarceration there.  (Doc. No. 1 at 2.) Plaintiff alleges that on May 31, 2018, he "suffered from one of his many mental disorders."  (Id. at 3.)  Plaintiff told two corrections officers that he wanted to kill himself and showed those

officers "cut marks" on his arms.  (Id.)  Plaintiff requested "medical and mental health treatment [but] both request[s] went unanswered."  (Id.)  Plaintiff alleges that instead of providing help, Defendant Dickson "only encouraged [his] self[-]harm despite Plaintiff's extensive suicide history."  (Id.)  Plaintiff maintains that later that day, he "placed a noose around his neck and attempted to hang himself[,] leaving a burn mark around [his] neck."  (Id.)

On June 16, 2018, Plaintiff "was again feeling suicidal and wanting to kill himself."  (Id.) He began to cut his wrist and neck with a sharpened staple.  (Id.)  Plaintiff showed Defendants Dell and Wasko and requested medical and mental health treatment.  (Id.)  He maintains that Defendants Dell and Wasko "stated save us the trouble."  (Id.)  Plaintiff indicated that he would file a grievance, and Defendants Dell and Wasko "stated that would not be wise and things can only get a lot worse."  (Id.)  Plaintiff alleges he engaged in self-harm again on June 26, 2018 and that his request for mental health treatment was denied.  (Id.)

On February 8, 2019, Plaintiff alleges that he "received an inmate appeal for misconduct."  (Id.)  Plaintiff avers that he had received a misconduct for destroying state property while engaged in self-harm despite a Department of Corrections ("DOC") policy stating that "inmates who destroy state property and engage in self harm will not be issued a misconduct."  (Id.)  Plaintiff alleges that Defendant Luther concluded that Plaintiff's cuts did not constitute a serious suicide attempt.  (Id.)  On February 11, 2019, Plaintiff spoke to Defendant Swisher about Defendant Luther "giving subordinates orders that Plaintiff['s] self[-]injury is not a serious matter and thus does not require attention."  (Id. at 4.)  Plaintiff maintains that Defendant Swisher agreed with Defendant Luther and "stated nothing will be done."  (Id.)

On March 21, 2019, Plaintiff and another inmate were engaging in self-harm when C/O Cantrell conducted security rounds.  (Id.)  Plaintiff avers that nothing was done to stop the self-

harm.  (Id.)  On March 22, 2019, Plaintiff raised "these concerns to Defendant Hollibaugh who stated just leave it alone Coit."  (Id.)  On May 4, 2019, Plaintiff "was feeling suicidal" and expressed his feelings to Defendant Williams.  (Id.)  He avers that Defendant Williams did nothing to provide Plaintiff mental health treatment.  (Id.)  Later that day, Defendant Williams was conducting security rounds when Plaintiff showed him that he had been using a staple to mutilate himself and cut his wrist.  (Id.)  Plaintiff avers that during that time, Defendant Ralph "approached [his] door[, saw] wounds[,] and stated you have to go deeper Mr. Coit then we will care."  (Id.)

Plaintiff avers further that at some time between March and May of 2019 Defendants Luther, Rivello, Wakefield, Garman, Sunderland, Fisher, and Swisher had a meeting in which they determined that Plaintiff's acts of self-harm should not be taken seriously because Plaintiff was only trying to be manipulative.  (Id.)  Plaintiff alleges that he learned of this meeting from Lieutenant Morgan, Lieutenant Moore, and several corrections officers assigned to the Behavioral Management Unit.  (Id.)

On July 28, 2019, Plaintiff told Defendant Shope that he was hearing voices telling him to kill himself.  (Id. at 5.)  Plaintiff avers that Defendant Shope "only encouraged Plaintiff to do so."  (Id.)  Plaintiff was left inside of his cell "for hours cutting [his] wrists with a staple."  (Id.)  Plaintiff also wrote on the walls with blood and threw blood on the window of his cell.  (Id.)  Plaintiff avers that staff failed to provide treatment or respond to him because of Defendants Luther, Rivello, Wakefield, Garman, Sunderland, Fisher, and Swisher "telling them to ignore Plaintiff during bouts of depression and suicide attempts."  (Id.)  On August 5, 2019, Plaintiff told Defendants Wakefield, Sunderland, Luther, and Fisher that he was suicidal.  (Id.)  Defendant Luther "stated they did not care because they did not have to deal with Plaintiff."  (Id.)  Later, at

3

approximately 2:00 p.m., Defendant Fisher approached Plaintiff's cell, and Plaintiff showed him that he had cut his wrists and the walls were covered in blood.  (Id.)

On August 9, 2019, Plaintiff was seen by medical staff, including Defendant Swisher, because of his placement in a Psychiatric Observation Cell ("POC") for suicide attempts.  (Id.) Plaintiff avers that medical staff determined that he needed further treatment than what was offered at the Behavioral Management Unit at SCI Smithfield.  (Id.)  On August 12, 2019, Plaintiff was discharged from the POC.  (Id.)  When he was placed back into his cell, he began to cut his wrist with a razor provided by staff.  (Id.)  Plaintiff was again placed in the POC "but no mental health treatment was provided during this period."  (Id.)  Plaintiff avers that instead of providing treatment, staff "punished [him] for exhibiting mental issues and retaliated [against him] for filing grievances and lawsuits."  (Id.)

On August 21, 2019, Plaintiff told Defendant Fisher that he was suicidal and was cutting himself.  (Id.)  Plaintiff avers that nothing was done to stop him.  (Id.)  The next day, Plaintiff told Defendants Stombaugh and Fisher that he was feeling depressed and suicidal.  (Id. at 6.) Plaintiff began to cut himself with a razor and avers that he "was left to bleed for at least 30 minutes allowing [him] to cover [his] whole cell with blood."  (Id.)  Plaintiff "laid down and ceased self[-]harm due to lightheadedness and dizziness."  (Id.)  On August 23, 2019, Lieutenant Morgan came to Plaintiff's cell and told Plaintiff to give him the razor.  (Id.)  Plaintiff "lied and told Morgan that there was no razor."  (Id.)  Plaintiff avers that he was then placed into a restraint chair "despite the fact that [he] was doing nothing at this point."  (Id.)  Plaintiff maintains that he was later released from the restraint chair "only to be allowed to resume self[-]harm."  (Id.)

On September 14, 2019, Plaintiff was in his cell while Defendant Stombaugh was passing out meals. (Id.) Plaintiff avers that Defendant Stombaugh got verbally aggressive and began making threats because Plaintiff had filed a grievance concerning what occurred on August 22, 2019. (Id.) Later that day, Certified Peer Specialist Williams came to Plaintiff's cell to "resolve the issue about not getting meal[s]." (Id.) Plaintiff avers that multiple corrections officers brought meals to his cell door but refused to feed Plaintiff because of Plaintiff's grievance activity. (Id.) According to Plaintiff, he was standing at the door of his cell when an unnamed Defendant "administered [oleoresin capsicum ("OC") spray for no reason." (Id.)

On October 22, 2019, Plaintiff told Defendant Shope that he was suicidal. (Id. at 7.) Plaintiff claims that Defendant Shope ignored him, so he covered his cell door window to get a lieutenant to come and take him to the POC. (Id.) Plaintiff alleges that instead of getting the lieutenant, Defendant Shope administered OC spray. (Id.) The lieutenant arrived after Defendant Shope used OC spray. (Id.) Plaintiff was placed in a strip cage but refused a strip search. (Id.) He avers that he was "[gassed] by Defendant Shope" pursuant to orders from Lieutenant Moore. (Id.) Plaintiff claims that he was not acting aggressively when this force was used. (Id.) Later that day, when Plaintiff was back in his cell, he began to bite holes in his arms. (Id.) He avers that Lieutenant Moore was notified but that nothing was done to stop him from harming himself. (Id.) Plaintiff ultimately hit an artery by biting a hole in his arm. (Id.) At approximately 10:30 p.m., an unknown corrections officer was conducting a security round and saw that Plaintiff's cell was covered in blood. (Id.) He called Lieutenant Glassko, who called for medical. (Id.) Plaintiff avers that he was taken to medical but refused treatment because he was suicidal. (Id.) However, he was not placed in the POC for mental health treatment. (Id.) Instead, Plaintiff claims, he was placed in a cell and "left bleeding all night." (Id. at 8.)

On October 23, 2019, Defendant Williams noticed that Plaintiff's cell was covered in blood and that the sink was filled with blood.  (Id.)  He called Lieutenant Morgan and Plaintiff was removed from his cell and placed in a strip cage.  (Id.)  Plaintiff avers that he was later placed in the POC "due to extreme blood loss" but that he "still refused medical treatment."  (Id.) Plaintiff claims that he was "profusely bleeding" until approximately 9:00 a.m.  (Id.)  At that time, an unknown lieutenant came to the POC to place Plaintiff in a restraint chair.  (Id.) Plaintiff maintains that he "complied but was becoming delusional due to blood loss and aggressive due to blood loss."  (Id.)  Plaintiff avers that the officers who placed him in the restraint chair made the straps so tight that he could not feel his extremities, and that he had bruising from the straps on his arms, buttocks, and backs of his ankles.  (Id.)  Plaintiff claims that he was held in the restraint chair "for nine hours with no food and no exercise."  (Id.) Ultimately, Plaintiff received an IV and nine (9) stitches for his wound.  (Id.)  He claims that he lost consciousness several times that day because of blood loss.  (Id. at 9.)

On October 31, 2019, Plaintiff filed a grievance regarding what occurred on October 22, 2019.  (Id. at 8.)  He avers that Defendant Fisher "took retaliatory actions on other inmates and gave Plaintiff a copy of inmates['] calls to family and another inmate['s] legal mail."  (Id.) Plaintiff claims that Defendant Hollibaugh retaliated against him by not processing his grievance.  (Id.)  On November 8, 2019, Plaintiff asked security to preserve video footage for October 31, 2019 "for evidence of placement of [his] grievance in [the] grievance box."  (Id. at 9.)

Plaintiff next avers that ever since his arrival at SCI Smithfield on March 31, 2018, Defendants Hollibaugh, Grassmyer, and Jadlocki "have been hindering Plaintiff's grievance process."  (Id.)  On August 22, 2019, Plaintiff maintains that Defendant Hollibaugh retaliated

against Plaintiff for filing grievances by placing him on a grievance restriction "because grievance officers [were] stating Plaintiff['s] suicide attempts were frivolous." (Id.) According to Plaintiff, this restriction is preventing him from filing a grievance about access to the law library and how there is no keyboard available to do legal work. (Id.) Plaintiff alleges further that Defendants have retaliated against him for filing grievances and lawsuits by not allowing him access to the DOC's abuse hotline and other measures used to report violations. (Id. at 10.)

Plaintiff alleges that Defendant Fisher is "intentionally singling [him out] due to grievances and lawsuit[s]." (Id.) According to Plaintiff, Defendant Fisher "has issued [him] misconducts for violations that all inmates do." (Id.) For example, Plaintiff alleges that Defendant Fisher wrote him up for misuse of the phone and avers that other prisoners misuse the phone but are not written up for it. (Id.) He avers that Defendant Fisher gave him a copy of the phone log to "create conflict between Plaintiff and other prisoners." (Id.) Plaintiff maintains that on October 20, 2019, Defendant Fisher circulated a memo telling staff in the Behavioral Management Unit that Plaintiff may not use the abuse hotline. (Id.) Plaintiff asserts that this restriction was not approved by Defendants Hollibaugh, Luther, Rivello, Wakefield, and Sunderland and that Defendant Fisher "took it upon himself to place Plaintiff on such restriction in order to retaliate." (Id.) Plaintiff avers further that Defendant Fisher has placed on him a "permanent spit hood," which causes Plaintiff to become depressed because other inmates call him "Hannibal Lecter." (Id. at 11.) Plaintiff alleges further that Defendant Stombaugh has retaliated against him for filing grievances by sexually harassing him. (Id.) Finally, Plaintiff states that on November 4, 2019, he attended a rule violation hearing. (Id. at 9.) He avers that Defendant Szelewski violated his due process rights and "stated during the sanction that[] it['s] all fair in love and war that's what happens when people file grievances and lawsuits." (Id.)

Based upon the foregoing, Plaintiff raised the following claims for relief: (1) First

Amendment violations regarding retaliation and access to the courts; (2) Eighth Amendment

violations regarding failure to protect, unconstitutional conditions of confinement, deliberate

indifference to medical needs, and excessive force; and (3) Fourteenth Amendment due process

and equal protection violations.  (Id. at 12.)  Plaintiff also raised a claim pursuant to the

Americans with Disabilities Act ("ADA").  (Id.)  Plaintiff seeks unspecified injunctive relief as

well as damages.  (Id. at 20.)

Defendants initially filed a motion to dismiss Plaintiff's complaint (Doc. No. 23) for

failure to allege plausible Eighth Amendment claims against them.  In a Memorandum and Order

dated July 23, 2020, the Court granted in part and denied in part the motion to dismiss.  (Doc.

Nos. 30, 31.)  The Court also screened Plaintiff's remaining claims pursuant to the Prison

Litigation Reform Act of 1995 ("PLRA")[1] and partially dismissed the complaint.  (Doc. Nos. 30,

31.)  Specifically, the Court granted the motion to dismiss with respect to Plaintiff's claims

against Defendant Ellenberger and denied the motion in all other respects.  (Doc. No. 31 at 1.)

The Court also dismissed the following claims without prejudice: (1) Plaintiff's First

Amendment access to the courts claim; (2) Plaintiff's Eighth Amendment claims regarding

failure to protect, denial of meals, and the use of excessive force on September 14 and October

23, 2019; Plaintiff's Fourteenth Amendment due process claim against Defendant Szelewski; and

(4) Plaintiff's ADA claims against Defendants in their official capacities.  (Id.)  His Fourteenth

Amendment due process claim against Defendants Hollibaugh, Grassmyer, and Jadlocki as well

as his ADA claims against Defendants in their individual capacities were dismissed with

---

[1] See The Prison Litigation Reform Act of 1995, Pub. L. No. 104-134, 110 Stat. 1321 (Apr. 26, 1996).

prejudice.  (Id.)  The Court granted Plaintiff leave to file an amended complaint within thirty (30) days.  (Id. at 1-2.)

Plaintiff did not file an amended complaint.  Accordingly, in an Order dated August 31, 2020, the Court dismissed with prejudice Plaintiff's claims against Defendant Ellenberger; his First Amendment access to the courts claim; his Eighth Amendment claims regarding failure to protect, denial of meals, and the use of excessive force on September 14 and October 23, 2019; his Fourteenth Amendment due process claim against Defendant Szelewski; and his ADA claims against Defendants in their official and individual capacities.  (Doc. No. 32.)  The Court noted that the above-captioned action would proceed as to Plaintiff's: (1) First Amendment retaliation claims; (2) Eighth Amendment claims regarding the solicitation of suicide, the denial of medical care, and Defendant Shope's use of excessive force; and (3) his Fourteenth Amendment equal protection claim against Defendant Fisher.  (Id.)  The remaining Defendants filed their answer on September 2, 2020.  (Doc. No. 33.)

Following the close of discovery, Defendants filed their motion for summary judgment and statement of facts on May 3, 2021.  (Doc. Nos. 39, 41.)  On May 17, 2021, Defendants moved for an extension of time to file additional exhibits regarding administrative exhaustion. (Doc. No. 43.)  In an Order dated May 18, 2021, the Court granted Defendants' motion and directed them to file their exhibits within seven (7) days.  (Doc. No. 44.)  The Court also observed that Defendants were raising the issue of whether Plaintiff properly exhausted his administrative remedies with respect to his claims in accordance with the PLRA and issued a Paladino Order informing the parties that it would consider the exhaustion issue in the context of summary judgment and, by doing so, would consider matters outside the pleadings in its role as

factfinder.[2]  (Id.)  The Court directed Plaintiff to file a brief in opposition and a responsive statement of material facts within thirty (30) days of the date on which Defendants filed their exhibits.  (Id.)  That same day, the Court received a brief in opposition from Plaintiff.  (Doc. No. 45.)  Defendants filed their additional exhibits on May 18, 2021.  (Doc. No. 47.)  Plaintiff filed another brief in opposition on May 24, 2021 (Doc. No. 48), and Defendants filed their reply brief on June 8, 2021 (Doc. No. 50).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) requires the Court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  See id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  A dispute of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 248; Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine dispute of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party.  See Clement v.

_____

[2] See Paladino v. Newsome, 885 F.3d 203 (3d Cir. 2018).

Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992).  To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (noting that the party opposing a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts").  When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence that demonstrates the absence of a genuine dispute of material fact, the nonmoving party is required to go beyond his pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine dispute.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case that it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex, 477 U.S. at 323.

In determining whether a dispute of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party.  See White, 862 F.2d at 59.  In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor.  See id.  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted."  See L.R. 56.1.  A party cannot evade these

litigation responsibilities in this regard simply by citing the fact that he is a <u>pro se</u> litigant.  These rules apply with equal force to all parties.  <u>See</u> <u>Mala v. Crown Bay Marina, Inc.</u>, 704 F.3d 239, 245 (3d Cir. 2013) (noting that <u>pro se</u> parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

## III.     STATEMENT OF MATERIAL FACTS[3]

Defendants Hollibaugh, Grassmyer, Ellenberger, Jadlocki, and Szelewski were dismissed from the above-captioned action on August 31, 2020.  (Doc. No. 41 ¶ 1.)  Plaintiff's deposition was taken under oath on November 6, 2020.  (<u>Id.</u> ¶ 2.)

Plaintiff asserts that on May 31, 2018, he was suffering from "one of his many mental disorders."  (<u>Id.</u> ¶ 3.)  During his deposition, Plaintiff "admitted that although he testified that C.O. Dickson told him to hang himself, his complaint did not state that allegation."  (<u>Id.</u> ¶ 4.)  "Defendants' video records and medical records refute [Plaintiff's] allegation regarding this incident."  (<u>Id.</u> ¶ 5.)

Plaintiff admitted that on June 16, 2018, he was feeling depressed and "cut himself with a sharpened staple at his wrist and neck."  (<u>Id.</u> ¶ 6.)  He testified that "he 'almost successfully killed [himself] a couple times.'"  (<u>Id.</u> ¶ 7.)  Plaintiff "admitted that he did not know which officer told him it would not be wise to file a grievance."  (<u>Id.</u> ¶ 8.)  Defendants' grievance

---

[3] Unless otherwise noted, the background herein is derived from Defendants' Rule 56.1 statement of facts.  (Doc. No. 41.) Although Plaintiff has filed two (2) oppositional briefs and several exhibits, he has not filed a response to Defendants' statement of material facts in compliance with Local Rule 56.1.  Accordingly, the Court deems the facts set forth by Defendants to be undisputed.  <u>See</u> Fed. R. Civ. P. 56(e)(2); M.D. Pa. L.R. 56.1; <u>United States v. Alberto</u>, No. 3:18-cv-1014, 2020 WL 730316, at *2 (M.D. Pa. Feb. 13, 2020) (concluding that the "[f]ailure to file this [responsive statement of material facts] results in admission of the moving party's statement of facts").

records "demonstrate that Plaintiff's claims are refuted based upon the medical records." (Id. ¶ 9.)

Plaintiff admitted that he "might have lashed out and probably went through a cell extraction and got sprayed, which happened on multiple occasions." (Id. ¶ 10.) "Plaintiff testified that his lashing out and having to be extracted from his cell 'probably' happened twice." (Id. ¶ 11.) He filed a grievance appeal stating that "he does not have a history of problems with his razor, and he filed a grievance about a razor restriction." (Id. ¶ 12.) Plaintiff "admitted that about once a month he tells the officers that he is feeling suicidal and needs treatment." (Id. ¶ 13.) "Despite saying this happened only about once a month, he admitted that his complaint stated [it] happened twice in 10 days." (Id. ¶ 14.)

Plaintiff stated that he received a misconduct for destroying a cable TV outlet on February 8, 2018 and that he admitted to the charge. (Id. ¶ 15.) Plaintiff's misconduct records, however, indicate that this event occurred on December 28, 2018. (Id. ¶ 16.) Plaintiff "admitted that he had already been in segregated confinement at the time of this incident." (Id. ¶ 17.) He admitted that he requested to go to the Psychiatric Observation Cell ("POC") on "numerous occasions." (Id. ¶ 18.) "Plaintiff also admitted that a 'lot of times' he found or kept sharpened pieces of metal." (Id. ¶ 19.) He testified that "LMP Swisher said that scratching himself with a staple was not a serious suicide attempt." (Id. ¶ 20.) On the occasions when Plaintiff's injuries "involved more bleeding that just scratches, he was taken for treatment." (Id. ¶ 21.)

Defendants assert that "[t]he claim regarding the Plaintiff and another inmate harming themselves on March 21, 2019 is based on hearsay from the other inmate," and maintain that

their records' "refute the allegations, particularly since the guards were not on duty that night."[4]

(Id. ¶¶ 22-23.) Plaintiff admitted that he was in the Behavioral Management Unit ("BMU") for

three (3) years. (Id. ¶ 24.) "Although the Plaintiff testified that on May 4, 2019 he was 'cutting

up,' his complaint does not state that claim." (Id. ¶ 25.) "Defendants' records of the grievance

refute this claim." (Id. ¶ 26.)

Defendants assert that "Plaintiff's evidence that Defendants Luther, Rivello, [Wakefield],

Garman, Sunderland, Fisher[,] and Swisher held a meeting about him was based on hearsay from

individuals not involved in the meeting."[5] (Id. ¶ 27.) He did not file a grievance regarding this.

(Id. ¶ 28.) "Plaintiff admitted that he was told that because he was engaged in manipulative

behavior his self-injurious behavior should not be taken seriously." (Id. ¶ 29.) Plaintiff "has

been 'hearing voices' since 2003 when he was 13 years of age." (Id. ¶ 30.)

Plaintiff stopped taking medication "because he felt that C.O.s were tampering with his

medication despite the fact that C.O.s do not hand out medication to inmates." (Id. ¶ 31.)

Plaintiff's medical records "demonstrate that when he was found to have broken up a razor, he

was placed on 'Accountability Status' and placed on razor restriction." (Id. ¶ 32.) "Plaintiff's

claim for July 28, 2019 was for cutting himself with a staple." (Id. ¶ 33.) His testimony "about

---

[4] While summary judgment proceedings are generally subject to the standards set forth in the
Federal Rules of Evidence, "hearsay statements can be considered on a motion for summary
judgment if they are capable of being admissible at trial." See Fraternal Order of Police, Lodge
1 v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016) (internal quotation marks and citation
omitted). Nothing in the record before the Court suggests that the individuals from whom
Plaintiff learned this information would be unavailable to testify should this case proceed to trial.
See id. at 239; see also McMillian v. Wetzel, 790 F. App'x 455, 458-59 (3d Cir. 2019)
(concluding that the district court erred in determining that the inmate-plaintiff's affidavits,
which contained hearsay, could not be considered to oppose a motion for summary judgment).
Accordingly, the Court declines to accept Defendants' legal conclusion that Plaintiff's evidence
in support of this claim constitutes hearsay.

[5] See supra n.4.

his claim for August 5, 2019 did not include any evidence that the Defendants named were aware if he had a means to commit suicide." (Id. ¶ 34.)  Plaintiff "admitted that he has swallowed batteries and razors." (Id. ¶ 35.)  Plaintiff later withdrew the grievance regarding this incident. (Id. ¶ 36.)

Plaintiff "cuts himself because it relieves his stress, and he does it when he feels he is being harassed." (Id. ¶ 37.)  On August 22, 2019, Plaintiff did not return the nail clippers and razor "because he intended to swallow the nail clippers and cut himself with the razor." (Id. ¶ 38.)  On August 23, 2019, when Lieutenant Morgan came to his cell, Plaintiff "lied and said he did not have a razor." (Id. ¶ 39.)  "Plaintiff admitted that he was keeping the razor in his mouth." (Id. ¶ 40.)  Grievance records refute Plaintiff's claims about being allowed to keep razors. (Id. ¶ 41.)

Plaintiff admitted "that he does not feel he has any responsibility for his own actions." (Id. ¶ 42.)  He admitted "that he refused a search on October 22, 2019." (Id. ¶ 43.)  On that date, Plaintiff "refused to go to medical despite the fact that he alleges he bit a hole in his arm because when he is suicidal he doesn't want anyone to help him." (Id. ¶ 45.)  He "called the Abuse Hotline somewhere between 10 and 20 times and[,] as a result, he was restricted from using the Abuse Hotline." (Id. ¶ 46.)  His "allegations regarding the Abuse Hotline and phone privileges are refuted by Defendants' Grievance document 833466." (Id. ¶ 47.)  "Plaintiff admitted that he lost phone privileges at one point for using another inmate's phone code." (Id. ¶ 48.)

## IV.   DISCUSSION

### A.   Administrative Exhaustion

Defendants assert that summary judgment is appropriate because "Plaintiff did not properly exhaust the grievances for the claims presented here." (Doc. No. 47 at 10.)  They

15

maintain that Plaintiff "continually" violated the provisions of DC-ADM 804, which sets forth the DOC's grievance procedure.  (Id. at 11.)

Pursuant to the PLRA, a prisoner must pursue all available avenues of relief through the applicable grievance system before initiating a federal civil rights action.  See 42 U.S.C. § 1997e(a); Booth v. Churner, 532 U.S. 731, 741 n.6 (2001).  Section 1997e provides, in relevant part, that "[n]o action shall be brought with respect to prison conditions under [S]ection 1983 of this title, or any other [f]ederal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  See 42 U.S.C. § 1997e(a).  The exhaustion requirement is mandatory.  See Woodford v. Ngo, 548 U.S. 81, 85 (2006); see also Booth, 532 U.S. at 741 (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures").

The United States Court of Appeals for the Third Circuit has further provided that there is no futility exception to Section 1997e's exhaustion requirement.  See Nyhuis v. Reno, 204 F.3d 65, 75-76 (3d Cir. 2000).  Moreover, courts have interpreted this exhaustion requirement as including a procedural default component, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding with a claim in federal court.  See Spruill v. Gillis, 372 F.3d 218, 230 (3d Cir. 2004); see also Oriakhi v. United States, 165 F. App'x 991, 993 (3d Cir. 2006) (providing that "there appears to be unanimous circuit court consensus that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after the filing of the complaint in federal court").

Recently, the Supreme Court considered what circumstances render administrative remedies unavailable to an inmate such that a failure to exhaust may be excused.  See generally

Ross v. Blake, 578 U.S. 632 (2016).  The Court noted "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." See id. at 643-644.  First, an administrative procedure is not available "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  See id.  Second, a procedure is not available when it is "so opaque that it becomes, practically speaking, incapable of use."  See id.  Finally, a procedure is unavailable when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misinterpretation, or intimidation."  See id.  However, "once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him."  See Rinaldi v. United States, 904 F.3d 257, 268 (3d Cir. 2018).  The Third Circuit Court of Appeals recently established that:

> to defeat a failure-to-exhaust defense based on a misrepresentation by prison staff, an inmate must show (1) that the misrepresentation is one which a reasonable inmate would be entitled to rely on and sufficiently misleading to interfere with a reasonable inmate's use of the grievance process, and (2) that the inmate was actually misled by the misrepresentation.

See Hardy v. Shaikh, 959 F.3d 578, 588 (3d Cir. 2020).

This broad rule favoring full exhaustion allows for a narrowly-defined exception; if the actions of prison officials directly caused the inmate's procedural default as to a grievance, the inmate will not be required to comply strictly with this exhaustion requirement.  See Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000).  However, courts also recognize a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." See Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002).  Thus, an inmate's failure to exhaust will be excused only "under certain limited circumstances," see Harris v. Armstrong, 149 F.

App'x 58, 59 (3d Cir. 2005), and an inmate may defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate."  See Warman, 49 F. App'x at 368.

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances warranting a departure from strict compliance with the exhaustion requirement, courts frequently reject inmate requests for their failure to exhaust to be excused.  An inmate, therefore, may not excuse a failure to comply with these grievance procedures in a timely manner by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement.  See Harris, 149 F. App'x at 59. Furthermore, an inmate may not avoid this exhaustion requirement by merely alleging that the administrative policies were not clearly explained to him.  See Warman, 49 F. App'x at 368. Consequently, an inmate's confusion regarding these grievances procedures does not, alone, excuse a failure to exhaust.  See Casey v. Smith, 71 F. App'x 916 (3d Cir. 2003); see also Marsh v. Soares, 223 F.3d 1217, 1220 (10th Cir. 2000) (noting that "it is well established that 'ignorance of the law, even for an incarcerated pro se petitioner, generally does not excuse prompt filing.'"

In his brief in opposition, Plaintiff argues that the Court should not grant summary judgment based on his failure to exhaust because he never received responses to many of his grievances.  (Doc. No. 45 at 1-6.)  He asserts that he "went above and beyond to continue to try to exhaust administrative remedies by filing additional grievances [regarding] missing grievances."  (Id. at 6.)  He avers that on multiple occasions, he requested the status of grievances and also requested copies of grievances in order to continue the grievance process,

but that these requests were not answered.  (Id.)  Defendants do not address this argument in their reply brief.

The Court has reviewed the many request slips, letters, and grievances Plaintiff submitted to support his opposition to summary judgment.  (Doc. No. 45.)  These documents reflect that on several occasions, Plaintiff wrote to staff members with concerns that: (1) he was not receiving responses to his grievances; (2) his grievances were not being handled properly; and (3) he required copies of grievances and responses thereto in order to continue the grievance process.  (Doc. Nos. 45-1, 45-2, 45-3.)  Given these submissions, the Court concludes that a genuine issue of fact exists as to whether the grievance process was rendered unavailable to Plaintiff such that his failure to exhaust certain grievances could be excused.  See Shifflett v. Korszniak, 934 F.3d 356, 365 (3d Cir. 2019) (concluding that "[a]s soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement").  The Court, therefore, declines to grant summary judgment on the basis that Plaintiff failed to exhaust his administrative remedies.  Accordingly, the Court considers the merits of Plaintiff's remaining claims below.

### B.    First Amendment Retaliation Claims

An inmate stating a retaliation claim pursuant to the First Amendment bears the burden of satisfying three (3) elements.  First, a plaintiff must prove that he was engaged in a constitutionally protected activity.  See Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).  Second, a plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials."  See id. (quoting Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).  This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary

19

firmness' from exercising his First Amendment rights." See id. (quoting Suppon v. Dadonna, 2013 F.3d 228, 235 (3d Cir. 2000)).  Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him."  See id. at 333-34 (quoting Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

The mere fact that an adverse action occurs after either a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events.  See Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 199 n.10 (3d Cir. 1996).  Only when the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal proximity, on its own, support an inference of causation.  See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997).  If a prisoner establishes a prima facie case of retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."  See Rauser, 241 F.3d at 334.  If the prison officials can make this showing, it defeats the retaliation claim.  See Carter v. McGrady, 292 F.3d 152, 159 (3d Cir. 2002).

### 1.    Protected Activity and Adverse Action

In his complaint, Plaintiff alleges that Defendants Stombaugh, Hollibaugh, Grassmyer, Jadlocki, and Fisher retaliated against him for engaging in protected activity by filing grievances and lawsuits.  (Doc. No. 1.)  Specifically, Plaintiff suggests that Defendants Hollibaugh, Grassmyer, and Jadlocki placed him on grievance restriction.  (Id.)  He avers further that Defendant Stombaugh denied him a meal, and that Defendant Fisher denied him access to the abuse hotline and issued various misconducts.  (Id.)

20

It is well-settled that inmates engage in protected activity when they file grievances and lawsuits.  See Anderson v. Davila, 125 F.3d 148, 161-62 (3d Cir. 1997).  Thus, the Court must consider whether the alleged adverse actions set forth above are actionable under § 1983.  To be actionable under § 1983, the adverse action "need not be great" but "must be more than de minimis."  See McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006) (internal quotation marks omitted).  Moreover, "[t]he cumulative impact of retaliatory acts may become actionable even though the actions would be de minimis if considered in isolation."  See Brennan v. Norton, 350 F.3d 399, 422 n.17 (3d Cir. 2003).

A panel of the Third Circuit Court of Appeals has noted, in a non-precedential opinion, that "being issued misconduct charges" constitutes "more than 'de minimis' adverse action[]." See Palmore v. Hornberger, 813 F. App'x 68, 70 (3d Cir. 2020) (citing McKee, 436 F.3d at 170). Another panel of the Third Circuit Court of Appeals has also suggested, in a non-precedential opinion, that being placed on grievance restriction can constitute sufficient adverse action.  See Glenn v. DelBalso, 599 F. App'x 457, 458 (3d Cir. 2015).  The Court assumes without deciding that denial of access to the inmate abuse hotline constitutes sufficient adverse action as well. However, a number of district courts have found that occasional denial of meals does not rise to the level of adverse action for purposes of a retaliation claim.  See, e.g., Brandon v. Burkhart, No. 1:16-cv-177, 2020 WL 10731719, at *11 n.10 (W.D. Pa. Nov. 16, 2020), report and recommendation adopted, 2021 WL 3563269 (W.D. Pa. Aug. 12, 2021); Purdie v. Graham, No. 9:09-cv-971, 2012 WL 1085817, at *7 (N.D.N.Y. Feb. 29, 2012), report and recommendation adopted in part and rejected in part, Purdie v. Connors, 2012 WL 1097321 (N.D.N.Y. Mar. 30, 2012).  This Court agrees that occasional denial of meals does not constitute sufficient adverse action.  Because the denial of a meal on occasion does not constitute sufficient adverse action,

21

the Court will grant summary judgment to Defendant Stombaugh with respect to Plaintiff's retaliation claim.

### 2. Causation

With respect to the third prong of a retaliation claim, while causation may be established by direct or circumstantial evidence, "motivation is almost never subject to proof by direct evidence."  See Watson, 834 F.3d at 422.  Thus, motivation is typically demonstrated by "evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link."  See id.

With respect to Defendant Jadlocki, the record is devoid of any evidence that Plaintiff ever filed a grievance against her.  See Royster v. Beard, 308 F. App'x 576, 579 (3d Cir. 2009) (affirming the district court's grant of summary judgment in favor of a defendant on the inmate-plaintiff's claim that he was retaliated against by an individual who was not the target of his protected activity).  Thus, "[t]here is no apparent reason why [Defendant Jadlocki] would want to retaliate against Plaintiff for filing [grievances] against others."  See Evans v. Rozum, No. 07-cv-230J, 2009 WL 5064490, at *22 (W.D. Pa. Dec. 17, 2009); see also Murray v. Smithbower, 1:17-cv-127, 2021 WL 1103524, at *7 (M.D. Pa. Mar. 23, 2021) (quoting Victor v. Lawler, 3:07-cv-2058, 2010 WL 5014555, at *5 (M.D. Pa. Dec. 3, 2010, aff'd, 565 F. App'x 126 (3d Cir. 2014)) (noting that courts "have consistently rejected retaliation claims 'against one defendant based on [protected activity] against another [individual]' for lack of retaliatory motive").  The Court, therefore, will grant summary judgment to Defendant Jadlocki with respect to Plaintiff's First Amendment retaliation claim.

As noted <u>supra</u>, Plaintiff avers that Defendants Hollibaugh and Grassmyer retaliated against him by placing him on grievance restriction.  The record reflects that on June 10, 2019, Plaintiff filed a grievance against Defendant Grassmyer, alleging that she was denying him due process by returning his legal mail for the third time.  (Doc. No. 47-15.)  Plaintiff's grievance was denied because an investigation reflected that he had already used the $11.00 allotted to indigent inmates per month for postage for legal mail.  (<u>Id.</u>)  Moreover, Plaintiff's submissions indicate that at some point in June of 2019, he filed a grievance alleging that Defendant Hollibaugh "continues to assign grievances to grievance officers who are not following DC ADM 804."  (Doc. No. 45-2 at 45.)  The record further suggests that Plaintiff was placed on grievance restriction at some point in August and September 2019.  (Doc. No. 41-10 at 3; Doc. No. 45-2 at 29-30.)  For temporal proximity alone to establish causation, the "timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."  <u>See</u> <u>Estate of Smith v. Marasco</u>, 318 F.3d 497, 512 (3d Cir. 2003) (quoting <u>Krouse</u>, 126 F.3d at 503).  A temporal proximity of two (2) months is insufficient to establish causation.  <u>See</u> <u>DeFranco v. Wolfe</u>, 387 F. App'x 147, 154-58 (3d Cir. 2010).  Thus, "[w]here the temporal proximity is not 'unusually suggestive,' [the Court must] ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'"  <u>See</u> <u>Leboon v. Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d 217, 232 (3d Cir. 2007) (quoting <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 280 (3d Cir. 2000)).

Plaintiff, however, has presented no evidence that Defendant Grassmyer was personally involved in the decision to place him on grievance restriction.  <u>See</u> <u>Jutrowski v. Twp. of Riverdale</u>, 904 F.3d 280, 291 (3d Cir. 2018) (noting that "in the face of [a] motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's

23

personal involvement in the alleged violation to bring that defendant to trial"). Likewise, Plaintiff's speculation that Defendant Hollibaugh placed him on grievance restriction solely to retaliate against him for filing a grievance against her is simply insufficient to create a genuine issue of material fact to survive summary judgment. See Alexander v. Forr, 297 F. App'x 102, 105 (3d Cir. 2008) (concluding that the district court properly granted summary judgment to the defendants on the inmate-plaintiff's retaliation claim because the inmate's "allegations of causation typically amount[ed] to no more than unsupported assertions"). The Court, therefore, will grant summary judgment to Defendants Hollibaugh and Grassmyer with respect to Plaintiff's retaliation claims against them.

Finally, Plaintiff suggests that Defendant Fisher retaliated against him for filing grievances by denying him access to the inmate abuse hotline and by issuing various misconducts. The record before the Court reflects that on December 28, 2018, Plaintiff received a misconduct for assault, refusing to obey an order, and destroying property. (Doc. No. 41-5 at 2.) That misconduct, however, was issued by Officer D. Smith. (Id.) Moreover, Defendant Fisher referred to a misconduct for fighting issued to Plaintiff on July 23, 2019 when responding to one of Plaintiff's inmate request slips regarding why his BMU phase was demoted, but nothing in the record establishes that the misconduct was personally issued by Defendant Fisher. (Doc. No. 45-2.) During his deposition, Plaintiff vaguely suggested that Defendant Fisher prohibited him from using the phone because of Plaintiff allegedly committing violations "that all inmates do." (Doc. No. 41-1 at 77.) Plaintiff has presented no evidence to support this speculation, and there is no evidence before the Court suggesting that Defendant Fisher was personally involved in the issuance of misconducts to Plaintiff. See Jutrowski, 904 F.3d at 291.

24

Moreover, even if the Court were to assume that Plaintiff's grievances against Defendant Fisher and Defendant Fisher's alleged denial of access to the inmate abuse hotline occurred in a close temporal proximity, the record before the Court establishes that Defendant Fisher "would have made the same decision absent the protected conduct for reasons related to a legitimate penological interest." See Rauser, 241 F.3d at 334.  The record indicates that the inmate abuse hotline had been frequently manipulated by inmates in the BMU, including Plaintiff, to make unauthorized personal calls.  (Doc. No. 41-11 at 2; Doc. No. 45-2 at 31.)  Prison officials have a legitimate penological interest in ensuring that the abuse hotline is being used properly and not for unauthorized purposes.  Upon review of the record, the Court concludes that there is a sufficient "quantum of evidence" to demonstrate that Defendant Fisher's restrictions upon Plaintiff's use of the inmate abuse hotline were reasonably related to legitimate penological interests and that he would have been subject to such restrictions regardless of his grievances. See Carter, 292 F.3d at 159.  The Court, therefore, will also grant summary judgment to Defendant Fisher with respect to Plaintiff's First Amendment retaliation claim.

### C.    Eighth Amendment Claims

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.  See Wharton v. Danberg, 854 F.3d 234, 247 (3d Cir. 2017).  There are several types of Eighth Amendment claims, including claims alleging: denial of, or inadequate access to, medical care; exposure to adverse conditions of confinement; the use of excessive force; and failure to protect from assaults by other inmates.  An Eighth Amendment claim includes both objective and subjective components.  See Wilson v. Seiter, 501 U.S. 294, 298 (1991).  Under the objective prong, the Court must consider "if the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation."  See Hudson v. McMillian, 503 U.S. 1,

8 (1992) (quoting <u>Wilson</u>, 501 U.S. at 298).  However, "[w]hat is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause depends upon the claim at issue."  <u>See</u> <u>id</u>.  The subjective component is met if the person or persons causing the deprivation acted with "a sufficiently culpable state of mind."  <u>See</u> <u>Wilson</u>, 501 U.S. at 298.

### 1.     Deliberate Indifference to Serious Medical Needs

### a.     Denial of Medical Care

Throughout his complaint, Plaintiff alleges that he was denied medical care on numerous occasions after injuring himself.  (Doc. No. 1.)  To establish an Eighth Amendment claim based on a prison's denial of medical care, an inmate must allege acts or omissions by prison officials that were sufficiently harmful to evidence deliberate indifference to a serious medical need.  <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 104-105 (1976).  The "deliberate indifference" prong of the Eighth Amendment test requires that the defendant actually know of and disregard "an excessive risk to inmate health or safety."  <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994). Circumstantial evidence may establish subjective knowledge if it shows that the excessive risk was so obvious that the official must have known about it.  <u>See</u> <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120, 133 (3d Cir. 2001) (citing <u>Farmer</u>, 511 U.S. at 842).

The Third Circuit Court of Appeals has found deliberate indifference when a prison official: "(1) knows of a prisoner's need for medical treatment and intentionally refuses to provide it; (2) delays necessary medical treatment for a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment."  <u>See</u> <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999).  Moreover, "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."  <u>See</u> <u>Spruill</u>, 372 F.3d at 236.  Accordingly, "absent a reason to believe (or

actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference."  See id.

As an initial matter, to the extent Plaintiff alleges he was denied medical attention for superficial scratches caused when he injured himself with a staple or other cutting implement, such injuries do not rise to the level of a serious medical need protected by the Eighth Amendment.  See Adams v. Bickert, No. 4:15-cv-467, 2015 WL 2244077, at *4 (M.D. Pa. May 12, 2015) (finding that cuts, scratches, and abrasions that require no more than small bandages are not serious medical needs); Gray v. Wakefield, No. 3:09-cv-979, 2012 WL 4509752, at *6 (M.D. Pa. Sept. 28, 2012) (noting that "the courts have repeatedly determined that [cuts, bruises, and bleeding] do not constitute a serious medical need"); see also Wisneski v. Denning, No. 12-864, 2014 WL 1758118, at *22 (W.D. Pa. Apr. 30, 2014) (noting that "[c]ourts throughout the country have found that bruising and abrasions with associated bleeding do not rise to the level of a 'serious medical need'");

During his deposition, Plaintiff admitted that he received medical attention "a couple times" when his self-harm involved more than "just scratches."  (Doc. No. 41-1 at 27.)  Plaintiff also admitted that on one (1) occasion, he lied to staff members and said that he did not have a razor when he was asked where his cutting implement was.  (Id. at 61-63.)  Moreover, on October 22, 2019, when an unnamed corrections officer saw that Plaintiff's cell was covered in blood, Plaintiff was taken to the medical department but refused treatment because "when [he is] suicidal, [he does not] want [anyone] to help [him]."  (Id. at 73.)  Furthermore, Plaintiff refused treatment several times after biting a hole in his arm and hitting an artery on October 22, 2019. Video evidence indicates that staff at SCI Smithfield were able to provide needed treatment to

Plaintiff only after placing him in a restraint chair.[6]  Furthermore, the record is replete with

Plaintiff's medical and mental health records indicating that he received continual care

throughout his incarceration at SCI Smithfield.  (Doc. Nos. 45-3, 47-1, 47-2, 47-3, 47-4, 47-5.)

Upon consideration of the record, the Court finds that Defendants have satisfied their burden

under Rule 56 of identifying evidence that demonstrates the absence of a genuine dispute of

material fact as to whether Defendants demonstrated deliberate indifference by denying needed

medical care to Plaintiff.  The Court, therefore, will grant summary judgment to Defendants with

respect to Plaintiff's Eighth Amendment claim concerning the denial of medical care.

### b.  Plaintiff's Vulnerability to Suicide

Plaintiff also alleges that Defendants failed to take steps to prevent him from injuring

himself in his attempts to commit suicide.  In his complaint, Plaintiff alleges that on May 31,

2018, he showed Defendant Dickson cut marks on his arms and requested medical and mental

health treatment, but that Defendant Dickson encouraged Plaintiff to continue engaging in self-

harm.  (Doc. No. 1 at 3.)  Plaintiff also alleges that, later that day, he placed a noose around his

neck, leaving a "burn mark," but no help was provided to him."  (Id.)  Plaintiff maintains further

that on June 16, 2018, he showed Defendants Dell and Wasko cut marks on his wrist from a

---

[6] The Court recognizes that "convicted prisoners . . . retain a limited right to refuse treatment."
See White v. Napoleon, 897 F.2d 103, 113 (3d Cir. 1990) (internal citations omitted).  "The
scope of the right to refuse treatment, however, must be circumscribed by legitimate
countervailing State interests."  See id.  Thus, "a prison may compel a prisoner to accept
treatment when prison officials, in the exercise of professional judgment, deem it necessary to
carry out valid medical or penological objectives."  See id.  To the extent Plaintiff asserts a
violation of his right to refuse treatment, the evidence before the Court clearly reflects that staff
deemed it necessary to provide medical treatment to Plaintiff on October 22-23, 2019, as video
evidence indicates that his self-inflicted wound would not cease bleeding even after the passage
of several hours.

sharpened staple.  (Id.)  He alleges that he requested mental health and medical treatment, but Defendants "stated save us the trouble."  (Id.)

Plaintiff avers that Defendants Luther, Rivello, Wakefield, Garman, Sunderland, Fisher, and Swisher determined that Plaintiff's self-harm attempts were not serious and should not be taken seriously because "Plaintiff is only trying to manipulate."  (Id. at 4.)  He also alleges that on May 5, 2018, he told Defendant Williams that he felt suicidal and showed him that he was using a staple to mutilate his wrist.  (Id.)  Plaintiff avers that Defendant Williams did nothing to stop him, and that when Defendant Ralph approached his cell, he saw Plaintiff's wounds and stated, "you have to go deeper Mr. Coit then we will care."  (Id.)  Plaintiff also maintains that on July 28, 2019, August 5, 2019, and August 21, 2019, Defendants Shope, Wakefield, Sunderland, Luther, and Fisher ignored his statements that he was suicidal and did nothing to stop him from cutting himself.  (Id. at 5.)

The Third Circuit Court of Appeals recently noted that "the vulnerability to suicide framework is simply a more specific application of the general rule set forth in Estelle v. Gamble . . . which requires that prison officials not be deliberately indifferent to the serious medical needs of prisoners."  See Palakovic v. Wetzel, 854 F.3d 209, 222 (3d Cir. 2017).  Thus, "a 'particular vulnerability to suicide' is just one type of 'serious medical need.'"  See id. (quoting Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991)).  To maintain a claim that officials failed to prevent him from injuring himself in an attempt to commit suicide, Plaintiff must demonstrate that "(1) [he] had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers 'acted with reckless indifference' to [his] particular vulnerability."  See Colburn, 946 F.2d at 1023.  Moreover, a plaintiff's announcement of an intent to kill himself indicates a "strong likelihood,

rather than a mere possibility, that self-inflicted harm will occur."  See id. at 1024 (internal

quotation marks omitted).

    In support of their motion for summary judgment, Defendants assert that Plaintiff's

solicitation of suicide claim should be dismissed because "any alleged 'solicitation of suicide'

had no effect on the Plaintiff because he used this as a bizarre means of relieving stress, which

has nothing to do with various Defendants['] alleged statements to him."  (Doc. No. 47 at 8.)

They state that, "[w]hen asked how the Defendants could get him to stop cutting himself, he

stated that was for DOC to worry about, not him."  (Id. at 8-9.)  Defendants argue that if Plaintiff

"does not know how to get him[self] to stop, Correctional Officers cannot be found liable for

failing to stop him."  (Id. at 9.)  Defendants' argument is misplaced, as it fails to focus on

Plaintiff's allegations that various Defendants encouraged him to self-harm even after Plaintiff

indicated, on several occasions, that he was feeling suicidal and took steps to harm himself.

     During his deposition, Plaintiff testified that on May 31, 2018, he told Defendant

Dickson that he wanted to kill himself, showed him the cut marks on his arms, and requested

medical and mental health treatment, but that those requests went unanswered.  (Doc. No. 41-1 at

9.)  He stated that Defendant Dickson "only told [him] to go ahead and kill [himself] and only

encouraged [him] to do it . . . and if [he] wanted to do it right, he tried to give [him] pointers on

how to do it."  (Id. at 10.)  Plaintiff testified that several other inmates heard Defendant Dickson

telling him these things.  (Id. at 11-12.)  He stated that on June 16, 2018, he told Defendants Dell

and Wasko that he was feeling suicidal and showed them cut marks on his wrists and neck.  (Id.

at 13.)  However, they refused his request for medical and mental health help.  (Id. at 14.)

Plaintiff also testified that Defendant Luther told corrections officers "not to worry about [his]

self-injurious behavior because [Plaintiff] scratching [himself] does not constitute a serious

suicide attempt."  (Id. at 26.)  He stated that on May 4, 2019, he showed Defendant Williams that

he was "cutting up" and nothing was done, and that Defendant Ralph told him that he had to "go

deeper."  (Id. at 32-33.)  Plaintiff testified further that several lieutenants at SCI Smithfield told

him that Defendants Luther, Rivello, Wakefield, Garman, Sunderland, Fisher, and Swisher

determined that Plaintiff's self-injurious behavior was not serious because he was only trying to

manipulate staff members.  (Id. at 34-36.)

      During his deposition, Plaintiff stated that on July 28, 2019, he told Defendant Shope that

he was hearing voices telling him to kill himself, and that Defendant Shope encouraged him to

do so.  (Id. at 38.)   Plaintiff testified that Defendant Shope told him "to go ahead and cut up, that

he wanted to—he wanted to see how deep [he] could go to see if [he] was serious, see how

serious [he] was about ending [his] life."  (Id.)  He indicated that on August 5, 2019, he told

Defendants Wakefield, Sunderland, Luther, and Fisher that he was feeling suicidal and that they

responded that "they did not care because they did not have to deal with [him]."  (Id. at 44.)

Plaintiff testified that this conversation occurred while those Defendants were making rounds on

his housing unit.  (Id. at 44-46.)

      As noted in his deposition, Plaintiff submitted several declarations from other inmates to

oppose Defendants' motion for summary judgment.  Inmate Christopher Balmer indicates that

during his time in the BMU, he witnessed staff members allow Plaintiff to cut himself on

multiple occasions and refuse to do anything.  (Doc. No. 45-3 at 66.)  Inmate Marcellus Jones

declares that he observed and heard Defendants Luther, Wakefield, Rivello, and Fisher tell

Plaintiff that he was not hurting anyone but himself, so he could "cut up [his] body all [he]

want[s]."  (Id. at 70.)  Inmate Jones also observed heard Defendants Luther and Fisher tell staff

members to let Plaintiff bleed.  (Id.)  Inmates Rasul Young, Arturo Moody, and Daaron Shears

make similar averments in their declarations.  (Id. at 74-77.)

Upon consideration of the evidence presented by the parties, the Court concludes that

there exist genuine disputes of material fact regarding whether Defendants knew that Plaintiff

had a particular vulnerability to suicide and acted with reckless indifference to such

vulnerability.  See Palakovic, 854 F.3d at 222; Colburn, 946 F.2d at 1023.  In their reply brief,

Defendants suggest that inmate Marcellus Jones' declaration should be given "no credence"

because he is "a serial frivolous lawsuit filer."  (Doc. No. 50 at 4.)  Defendants also suggest that

"[t]hese inmates need to get their stories straight."  (Id.)  The Court, however, cannot partake in

such a credibility assessment at the summary judgment stage.  See Anderson, 477 U.S. at 252.

Viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that

Defendants chose to act with reckless indifference to Plaintiff's vulnerability to suicide attempts.

Accordingly, the Court will deny summary judgment as to Plaintiff's solicitation of suicide

claim.

## 2.    Excessive Force

In his complaint, Plaintiff alleges that on October 22, 2019, Defendant Shope

administered OC spray right away instead of de-escalating a situation where Plaintiff had

covered his cell window "to get a [lieutenant] to take [him]" to the POC.  (Doc. No. 1 at 7.)  The

Eighth Amendment's protection against cruel and unusual punishment is the "primary source of

substantive protection in cases . . . where the deliberate use of force is challenged as excessive

and unjustified."  See Whitley v. Albers, 475 U.S. 312, 327 (1986).  The standard governing the

Court's inquiry as to whether a plaintiff has a viable Eighth Amendment excessive force claim is

"whether force was applied in a good faith effort to maintain or restore discipline or maliciously

and sadistically for the very purpose of causing harm."  See id. at 320 (citation omitted).  In making this determination, courts are tasked with evaluating the following factors:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 321).

During his deposition, Plaintiff testified that on October 22, 2019, he told Defendant Shope that he was feeling suicidal and asked to go to the POC.  (Doc. No. 41-1 at 63.) Defendant Shope, however, walked away.  (Id.)  When he returned, he found that Plaintiff had covered his cell door.  (Id.)  Plaintiff testified that "instead of getting . . . the lieutenant, [Defendant Shope] just sprayed [him], like gave [him] no warnings at all, he just sprayed [him]." (Id. at 64.)  Plaintiff maintained that Defendant Shope did not follow DOC policy regarding the use of force continuum and sprayed him with OC spray without attempting to "deescalate the situation."  (Id. at 65.)

As an initial matter, to the extent that Plaintiff asserts a claim based upon Defendant Shope's alleged failure to adhere to the DOC's policy regarding the use of force continuum, such a violation is not actionable under § 1983.  See Bullard v. Scism, 449 F. App'x 232, 235 (3d Cir. 2011) (concluding that the inmate-plaintiff could not maintain a due process claim based upon "possible technical non-compliance with [a Bureau of Prisons] regulation") .  "The use of chemical agents to subdue recalcitrant prisoners is not cruel and unusual when reasonably necessary."  Gibson v. Flemming, 837 F. App'x 860, 862 (3d Cir. 2020) (citing Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984)).  In Gibson, the inmate-plaintiff alleged that officers used excessive force against him by using OC spray.  See id.  The Third Circuit Court of Appeals

agreed, in a non-precedential opinion, that the inmate-plaintiff could not maintain his Eighth

Amendment claim because he had "told officers that he was suicidal and tied a sheet around his

neck before the officer sprayed him with [OC] spray." See id. The Third Circuit Court of

Appeals noted that the "unplanned use of force was required to prevent [the inmate-plaintiff]

from hurting himself[, and] that he "suffered no injuries beyond the temporary discomfort of the

OC spray." See id.

The Court finds Gibson to be persuasive for purposes of Plaintiff's Eighth Amendment

excessive force claim. Like the inmate-plaintiff in that matter, Plaintiff told Defendant Shope

that he was suicidal. Shortly thereafter, Plaintiff covered his cell door window, obstructing the

view inside his cell. Without such a view, officers had no way of discerning whether Plaintiff

was harming himself in light of his statement that he felt suicidal. Thus, Defendant Shope's use

of OC spray was reasonable to prevent Plaintiff from hurting himself and to gain access to

Plaintiff's cell to remove the obstruction from his window. Moreover, Plaintiff has presented no

evidence that he "suffered [any] injuries beyond the temporary discomfort of the OC spray." See

id. The Court, therefore, will grant summary judgment to Defendants with respect to Plaintiff's

Eighth Amendment excessive force claim.

### D.   Fourteenth Amendment Equal Protection Claim

Plaintiff also asserts that Defendant Fisher violated his equal protection rights by issuing

Plaintiff misconducts for misuse of the phone and not issuing misconducts to other inmates for

the same violations. (Doc. No. 1 at 10.) He maintains that Defendant Fisher "intentionally

[singled him out] due to grievances and lawsuit[s]." (Id.) In his deposition, Plaintiff testified

that inmates in the BMU are "authorized two phone calls a week when you're in a certain phase,

and when I attempted to use the phone, [Defendant Fisher] would tell the correctional officers

not to let me use the phone."  (Doc. No. 41-1 at 77.)  Plaintiff averred that "when other prisoners [were] using the phone, [Defendant Fisher] let them get off four, five, six phone calls a week and then [told Plaintiff he] couldn't use the phone because [Plaintiff] kept filing grievances on him." (Id.)  Plaintiff admitted to using another inmate's phone code to make a call after Defendant Fisher had issued him misconducts and told other officers not to use the phone.  (Id. at 77-78.) Plaintiff also testified that he was placed on "abuse hotline restriction because [he] abuse[s] the abuse hotline."  (Id. at 79-80.)  In response to Defendants' motion for summary judgment, however, Plaintiff has submitted a copy of an incident report issued by Defendant Fisher to inmate Gabriel Rosa-Diaz.  (Doc. No. 45-2 at 48.)  This document indicates that Defendant Fisher charged inmate Rosa-Diaz with, inter alia, unauthorized use of the telephone for using another inmate's PIN to place a call to that inmate's brother.  (Id.)

The Equal Protection Clause requires all persons "similarly situated" to be treated alike by state actors.  See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Traditionally, to maintain a § 1983 claim under the Equal Protection Clause, a plaintiff must demonstrate that he "receiv[ed] different treatment from that received by other individuals similarly situated."  See Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir. 1992) (citation omitted).  However, where a plaintiff alleges that he alone "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment," he may raise a "class of one" equal protection claim.  See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  To maintain such a claim, a plaintiff must establish that he has been irrationally singled out for disparate treatment.  See id.  To "state a claim under [a class of one theory], a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was

no rational basis for the difference in treatment."  See Hill v. Borough of Kutztown, 455 F.3d

225, 239 (3d Cir. 2006).  When alleging the existence of similarly situated individuals, "bald

assertion[s] that other[s] . . . were treated in a dissimilar manner" will not suffice.  See Young v.

New Sewickley Twp., 160 F. App'x 263, 266 (3d Cir. 2005).

      In the instant case, Plaintiff does not state that he is a member of a protected class.

Indeed, prisoners are not a protected class of individuals.  See Abdul-Akbar v. McKelvie, 239

F.3d 307, 317 (3d Cir. 2001) (concluding that prisoners are not a suspect class). Moreover, upon

review of the record, the Court cannot conclude that there exists a genuine dispute of material

fact that Defendant Fisher intentionally treated Plaintiff differently from other inmates or treated

other inmates more favorably in any respect.  Indeed, Plaintiff's own exhibit indicates that

Defendant Fisher issued a misconduct to another BMU inmate for misuse of the phone.

Plaintiff's allegations that his equal protection rights were violated are simply "bald assertions"

that fail to allege "occasions and circumstances" of different treatment.  See Young, 160 F.

App'x at 266.  The Court, therefore, will grant Defendants' motion for summary judgment with

respect to Plaintiff's Fourteenth Amendment equal protection claim.

## V.    CONCLUSION

      For the foregoing reasons, the Court will grant in part and deny in part Defendants'

motion for summary judgment.  (Doc. No. 39.)  An appropriate Order follows.